UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Bradley J. Lundberg,                                File No. 22-cv-2188 (ECT/DLM)

        Plaintiff,

v.                                                **OPINION AND ORDER**

UNUM Life Insurance Company of
America,

        Defendant.

---

Katherine L. MacKinnon, Law Office of Katherine L. MacKinnon, St. Paul, MN, and
Nicolet Lyon, Ronstadt Law, Phoenix, AZ, for Plaintiff Bradley J. Lundberg.

Terrance J. Wagener and Jake W. Elrich, Messerli & Kramer P.A., Minneapolis, MN, for
Defendant UNUM Life Insurance Company of America.

---

In this ERISA lawsuit, Plaintiff Bradley J. Lundberg seeks to recover long-term
disability benefits under an employee welfare benefit plan (the "Plan") sponsored by his
former employer, Blue Cross and Blue Shield of Minnesota, and insured and administered
by Defendant Unum Life Insurance Company of America. Mr. Lundberg applied for
benefits, and Unum approved his claim and began paying benefits in 2018. In 2021, after
paying benefits for more than three years, Unum determined that Mr. Lundberg was not
disabled and terminated his benefits. In line with the Plan's administrative procedures,
Mr. Lundberg appealed the decision to terminate his benefits. Unum affirmed the initial
termination decision, prompting Mr. Lundberg to file this case.

Mr. Lundberg and Unum have filed competing motions seeking judgment on the administrative record pursuant to Federal Rules of Civil Procedure 39(b) and 52(a)(1).  In doing so, the parties have made clear that they wish the Court to exercise its factfinding function and enter judgment based on the administrative record and briefs filed in connection with the motions.  Judgment will be entered for Mr. Lundberg because a preponderance of the evidence supports his benefits claim.

I[1]

A

*The Plan provides benefits to covered Blue Cross employees who become disabled.* For the first twenty-four months after an eligibility period[2] is exhausted, the Plan defines disability based on a "regular occupation" definition:

> You are disabled when Unum determines that:
>
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
>
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

---

[1]     This opinion describes the factual findings and legal conclusions required by Rule 52(a)(1).  The administrative record runs 4,319 pages in length.  It was filed in Bates-numbered order at ECF Nos. 23-1 to 23-9.  Citations in this opinion will refer to the administrative record by the short form "AR" and to specific pages by their assigned Bates numbers, located in the bottom-right corner of each page.

[2]     The Plan refers to this eligibility period as the "elimination period"; it is the period during which a claimant must be "continuously disabled" before he becomes eligible to receive long-term disability benefits.  AR at 69.  The period runs "the later of . . . 180 days; or the date your self-insured Short-Term Disability payments end, if applicable."  *Id.*

AR at 69. "You" refers to the participant. AR at 87. "Regular occupation" means "the occupation you are routinely performing when your disability begins," considering "your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." AR at 86. The Plan defines "[l]imited" as "what you cannot or are unable to do." AR at 85. "Material and substantial duties" are those that "are normally required for the performance of your regular occupation" and "cannot be reasonably omitted or modified." *Id.* "Injury" is defined as "a bodily injury that is the direct result of an accident and not related to any other cause." *Id.* "Sickness" is "an illness or disease." AR at 87. For a claim involving either a sickness or injury, "[d]isability must begin while you are covered under the plan." AR at 85, 87. After the first 24 months of payments, the Plan defines "disabled" by reference to an "any gainful occupation" standard:

> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

AR at 69. "Gainful occupation" means "an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds . . . 80% of your indexed monthly earnings, if you are working" or "60% of your indexed monthly earnings, if you are not working." AR at 84.

## B

*Mr. Lundberg worked for Blue Cross as a senior recovery specialist.* The position involved reviewing, investigating, and processing claims, taking customer calls, and

3

processing customer correspondence.  AR at 48, 904, 919.  Mr. Lundberg worked at a computer all day, performing data entry and analysis, researching, using computer applications, sending and receiving emails, and typing.  AR at 48, 920.  Later, in connection with Mr. Lundberg's benefits claim, Unum would categorize the position as most like that of "Insurance Claim Examiner" in the national economy, involving "[s]edentary work" that required "[m]ostly sitting, [and] may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 Lbs occasionally, and require[d] frequent near acuity, accommodation."  AR at 915, 2251, 2509, 2820, 4274, 4276; *see* AR at 2513, 2821 (noting that the insurance claim examiner position required "near acuity and visual accommodation" between 2.5–5.5 hours a day in an 8-hour workday).

   *Mr. Lundberg has a history of eye-related and other health problems that did not cause him to be disabled.*  For example, Mr. Lundberg wore glasses starting at age two, and he had "strabismus[3] surgery at 4 or 5 [years old] for an eye turn."  AR at 3781.  He also had nearsightedness (or "myopia"), astigmatism,[4] and presbyopia[5] in both eyes.  AR at 1975, 2551, 3779, 3796.  Mr. Lundberg's other medical conditions included asthma, chronic fatigue, cognitive change, environmental allergies, esophageal reflux,

---

[3]   Strabismus is "[a] manifest lack of parallelism of the visual axes of the eyes." *Strabismus*, *Stedman's Medical Dictionary* (28th ed. 2006).

[4]   Astigmatism occurs when "[the] lens or optic system [has] different refractivity in different meridians."  *Astigmatism*, *Stedman's Medical Dictionary* (28th ed. 2006).

[5]   Presbyopia is "[t]he physiologic loss of accommodation in the eyes in advancing age, said to begin when the near point has receded beyond 22 cm (9 inches)."  *Presbyopia*, *Stedman's Medical Dictionary* (28th ed. 2006).

hypertension, irritable bowel syndrome, multiple food allergies, morbid obesity, high cholesterol, hypothyroidism, and vitamin D deficiency. AR at 3910–11. At least through late 2016, the record does not show that any one of these conditions—or some combination of them—caused Mr. Lundberg to be disabled.

*Mr. Lundberg experienced more significant eye problems in late 2016 and early 2017, beginning with dimming vision.* On January 6, 2017, after experiencing blurred and dimming vision and flashes in his eyes "like after a flash bulb go[es] off," Mr. Lundberg was examined by Tammy H. Peterson, M.D. AR at 1064–75. Dr. Peterson diagnosed Mr. Lundberg as suffering from "[t]ransient vision disturbance of right eye[,] [n]asal field defect, right[, and] [o]ptic nerve swelling." AR at 1071–75. Dr. Peterson referred Mr. Lundberg to a neurologist "for evaluation of cause of OD[6] ONH swelling and treatment if needed," and cautioned Mr. Lundberg to "seek care if [he had] any loss of vision, increasing pain, or field restriction." AR at 1072. In a letter referring him to the neurologist, Dr. Peterson explained:

> [Mr. Lundberg] was in to see me on the afternoon of January 6th on an emergent basis with complaints of dimming of the vision in the right eye "like after a flash bulb goes off[.]" The dimming is noted more in his inferior-temporal field of view and bright lighting seems to worsen the blur. He notes he has had infrequent episodes of this dimming over the past few months, but they cleared without change in his vision.
>
> Over the past few days he has noted that the episodes, lasting up to an hour, have been continuing much more frequently. He denies photophobia, eye pain, or pain with change in gaze. He

---

[6]     In this context, "OD" appears to refer to "oculus dexter," or the "right eye." *See O.D., Stedman's Medical Dictionary* (28th ed. 2006).

has frequent headaches, but does not associate the visual blur with a headache.

His acuity in the right eye is 20/25- (he is amblyopic[7] in the right eye). Pupil responses were normal. EOM[8] movements were smooth with no pain or diplopia noted. There was no appreciable color desaturation.

A dilated fundus[9] examination of the right eye showed no retinal defects. However, he had blurring of the margins and a slight elevation of the nerve head. No vascular abnormalities or disc hemorrhages were noted. The left eye had a flat optic nerve with distinct margins. Visual field testing showed an inferior-temporal defect in the right eye, but the left eye was normal.

AR at 1075.

On January 9, 2017, Mr. Lundberg experienced pressure behind his right eye, worsening blurred vision, and decreased peripheral right and lower vision in his right eye, prompting an emergency room visit. AR at 1076, 1080. In the Mercy Hospital emergency room, Mr. Lundberg's blood pressure was measured at 224/122, or "very hypertensive." AR at 1076–1081. Mr. Lundberg denied "headache, eye pain, nausea, vomiting,

---

[7]     Amblyopia is "[p]oor vision caused by abnormal development of visual areas of the brain in response to abnormal visual stimulation during early development." *Amblyopia*, *Stedman's Medical Dictionary* (28th ed. 2006).

[8]     EOM is an "[a]bbreviation for extraocular *muscles*," *EOM*, *Stedman's Medical Dictionary* (28th ed. 2006), which are "the muscles within the orbit but outside of eyeball, including the four rectus muscles (i.e., superior, inferior, medial and lateral); two oblique muscles (i.e., superior and inferior), and the levator of the superior eyelid (i.e., levator palpebrae superioris)," *Extraocular muscles*, *id*.

[9]     The fundus is "the portion of the interior of the eyeball around the posterior pole, visible through the ophthalmoscope." Fundus of eyeball, Stedman's Medical Dictionary (28th ed. 2006).

numbness[,] or weakness." AR at 1076. Mr. Lundberg underwent a head and brain CT scan, an MRI, and an MRA,[10] but these imaging studies revealed no significant problem. AR at 1078, 1083–85.

*Mr. Lundberg followed up with a neurologist on January 10, 2017.* At this visit, Mr. Lundberg reported a "longstanding history of headaches" and "a history of blurred vision, pronounced on the right" that was "intermittent for the last couple of months" and "accompanied by photophobia."[11] AR at 983. In a medical record documenting the examination, neurologist Chad D. Evans, M.D., described his impression that Mr. Lundberg was suffering from "[v]ision disorder" and "[i]ntercranial hypertension."[12] AR at 985. Dr. Evans scheduled a lumbar puncture[13] with opening pressure "as a

---

[10]   "MRA" refers to Magnetic Resonance Angiography, "a type of MRI that looks specifically at the body's blood vessels." *Magnetic Resonance Angiography*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/magnetic-resonance-angiography-mra (last visited Apr. 3, 2024).

[11]   Photophobia, or "photalgia," is "[l]ight-induced pain, especially of the eyes; for example, in uveitis, the light-induced movement of the iris may be painful." *Photalgia*, *Stedman's Medical Dictionary* (28th ed. 2006).

[12]   "Idiopathic intracranial hypertension (IIH) is a disorder related to high pressure in the brain." *Idiopathic Intracranial Hypertension*, Cedars-Sinai, https://www.cedars-sinai.org/health-library/diseases-and-conditions/i/pseudotumor-cerebri.html (last visited Apr. 3, 2024).

[13]   "A lumbar puncture (spinal tap) is a test used to diagnose certain health conditions. It's performed in [the] lower back, in the lumbar region. During a lumbar puncture, a needle is inserted into the space between two lumbar bones (vertebrae) to remove a sample of cerebrospinal fluid. This is the fluid that surrounds [the] brain and spinal cord to protect them from injury." *Lumbar Puncture (spinal tap) Overview*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/lumbar-puncture/about/pac-20394631 (last visited Apr. 3, 2024).

diagnostic/treatment strategy for his symptoms" and to "eval[uate] pseudotumor,"[14] and referred Mr. Lundberg for a neuro-ophthalmologist consultation.  AR at 985–87.

*Mr. Lundberg was examined by a neuro-ophthalmologist, Dr. Lee, on January 18, 2017*.  The neuro-ophthalmologist, Michael Shi Young Lee, M.D., diagnosed Mr. Lundberg with anterior ischemic optic neuropathy ("AION"),[15] subjective visual disturbance, and pseudopapilledema,[16] bilateral.  AR at 1014, 1019.  Dr. Lee wrote:

> [Mr. Lundberg] has sudden vision loss RIGHT eye with progression.  This was predominantly painless, but recently has had headache behind his RIGHT eye.  The right optic nerve is swollen today but the LEFT eye shows pseudopapilledema.  He has an appearance of optic disc drusen[17] in that LEFT eye.  I reviewed his MRI personally, there is no partially empty sella or flattened globes.  His opening pressure was 13 centimeters h20 and I doubt he has Idiopathic Intracranial Hypertension (IIH).  This scenario is most consistent with Anterior ischemic optic neuropathy (AION).

---

[14]     A pseudotumor is "a disorder . . . characterized clinically by headache, blurred vision, and visual obscurations resulting from increased intracranial hypertension; on clinical examination, papilledema is detected but on neuroimaging studies there is no evidence of an intracranial mass lesion and the ventricles are either of normal size or small; if untreated, occasionally results in permanent visual loss; of an unknown cause."  *See Pseudotumor, Stedman's Medical Dictionary* (28th ed. 2006).  Pseudotumor is a synonym for "idiopathic intracranial hypertension."  *Id*.

[15]     AION involves a loss of blood supply that "deprives the optic nerve tissue of oxygen and results in damage to part or all of the optic nerve."  AR 1021.  "This is a small 'stroke' in the optic nerve but unlike other strokes is unassociated with weakness, numbness, or loss of speech, nor is there an increased risk of a classic stroke later."  *Id.*

[16]     Pseudopapilledema is an "[a]nomalous elevation of the optic disc; seen in severe hyperopia and optic nerve drusen."  *Pseudopapilledema*, *Stedman's Medical Dictionary* (28th ed. 2006).

[17]     "Optic disc drusen are abnormal deposits of protein-like material in the optic disc—the front part of the optic nerve."  AR at 1024.

AR at 1014–15.  At that time, Mr. Lundberg's visual acuity (corrected with glasses) was 20/25 -2 in the right eye and 20/20 in his left eye.  AR at 1017.  Dr. Lee explained that, while "[m]ost patients with ischemic optic neuropathy will have relatively stable vision . . . much of the visual field defect (difficulty seeing above or below) will not improve."  AR at 1023.

   *Dr. Lee examined Mr. Lundberg again on February 28, 2017.*  At this examination, Mr. Lundberg reported that his "vision in left eye [was] worse since the last visit," and that he was experiencing "intermittent vertigo when focusing at work or watching tv."  AR at 948, 950.  In a record documenting this examination, Dr. Lee wrote:

> [Mr. Lundberg] has sudden painless vision loss RIGHT eye with progression beginning of Jan along with headaches behind right eye.  He had right optic nerve swelling consistent with NAION[18] and pseudopapilledema of the left eye consistent with optic nerve head drusen.
>
> He recently started antihypertensive medications which is [sic] still inadequately controlling his blood pressure.  His visual fields show slight upward progression of his altitudinal defect[19] of the right eye, which is typical for NAION but resolution of superior field defect.  The left eye is normal.  OCT[20] shows

---

[18]    "Non-arteritic anterior ischemic optic neuropathy (NAION) is a potentially debilitating condition that occurs from a lack of sufficient blood flow to the optic nerve."  *Eye Stroke – Penn Ophthalmology*, Penn Medicine, https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-service/ophthalmology/eye-stroke  (last  visited Apr. 3, 2024).

[19]    An "altitudinal field defect" is a "[l]oss of all or part of the superior or inferior half of the visual field" that "does not cross the horizontal median."  *See Types of Field Defects*, Merck Manual, https://www.merckmanuals.com/professional/multimedia/table/types-of-field-defects (last visited Apr. 3, 2024).

[20]    OCT is an "[a]bbreviation for optic coherence *tomography*."  *OCT*, *Stedman's Medical Dictionary* (28th ed. 2006).  Optic coherence tomography is "a noninvasive

improvement in right optic nerve swelling. Dilated fundus examination now shows sectorial pallor[21] of the right eye. Ultrasound today shows possible buried drusen[22] of the right eye and drusen of the left eye.

AR at 949. Mr. Lundberg's corrected vision at this visit was 20/40 + 2 in the right eye and 20/20 in the left eye. AR at 950. Among other treatment options, Dr. Lee recommended that Mr. Lundberg use computer glasses instead of bifocals "due to his inferior field defect of the right eye" and that he return for a subsequent examination in one year. AR at 949–50.

*In November 2017 and January 2018, Mr. Lundberg was examined by an optometrist.* On November 2 and 8, 2017, Mr. Lundberg was examined by Jill Schultz, O.D. *See* AR at 1300–09, 3800–07. Though the administrative record contains a number of legible charts and graphs from these visits, Dr. Schultz's notes are not legible. *See* AR at 3800–7. Later records show that Dr. Schultz diagnosed Mr. Lundberg with "convergence insufficiency"[23] at the November 2 visit, and that she recommended he wear

---

imaging technique using light waves to obtain high-resolution cross-sectional images of the retina; application in several macular or retinal diseases." *Optic coherence tomography*, *Stedman's Medical Dictionary* (28th ed. 2006).

[21]   Sectorial means "[r]elating to a sector." *Sectorial*, Stedman's Medical Dictionary (28th ed. 2006). Pallor is "[p]aleness, as of the skin." *Pallor*, Stedman's Medical Dictionary (28th ed. 2006).

[22]   Drusen are "[s]mall bright structures seen in the retina and in the optic disk." *Drusen*, *Stedman's Medical Dictionary* (28th ed. 2006).

[23]   Convergence insufficiency is "that condition in which an exophoria or exotropia is more marked for near vision than for far vision." *Convergence insufficiency*, *Stedman's Medical Dictionary*, Westlaw (database updated Nov. 2014). It occurs "when the eyes have trouble working together while focusing on an object that is close by." *Convergence*

10

glasses for both distance and close reading and continue with occupational therapy.  AR at

1290 (showing "past diagnosis" from 11/2/2017 visit).  At an examination on January 9,

2018, Mr. Lundberg reported to Dr. Schultz that he was experiencing eye pain, headaches,

double vision, eye strain, light sensitivity, and night glare.  AR at 1295.  In a note

documenting the examination, Dr. Schultz wrote:

> Ocular health was unremarkable today aside from pallor of OD
> optic nerve.    Patient also has high astigmatism and
> amblyogenic[24] amount of anisometropia[25] with shallow
> amblyopia OD.  No reduction of BCVA[26] today as he was
> 20/25+ today.  Patient is having headaches and that could be
> the cause of his eye issue.  Another possibility is now that he
> is wearing glasses he is now more binocular, which is causing
> some confusion.

AR at 1297.

Dr. Lee examined Mr. Lundberg on February 27, 2018.  In a record documenting

this examination, Dr. Lee listed diagnoses of AION, subjective visual disturbance, drusen

of optic disc, bilateral, and alternating esotropia.[27]  AR at 954.  Mr. Lundberg complained

---

*Insufficiency*,   Cedars-Sinai,   https://www.cedars-sinai.org/health-library/diseases-and-conditions/c/convergence-insufficiency.html (last visited Apr. 3, 2024).

[24]    Amblyogenic means "[i]nducing amblyopia."  *Amblyogenic, Stedman's Medical Dictionary* (28th ed. 2006).

[25]    Anisometropia is "[a] difference in the refractive power of the two eyes." *Anisometropia*, *Stedman's Medical Dictionary* (28th ed. 2006).

[26]    BCVA stands for best corrected visual acuity.  *Glossary of Terms*, Univ. of Rochester    Med.    Ctr.,    https://www.urmc.rochester.edu/eye-institute/lasik/about-vision/glossary.aspx (last visited Apr. 3, 2024).

[27]    Esotropia is "an eye condition that refers to either one or both of your eyes pointing inward."         *Esotropia*,         Cleveland         Clinic, https://my.clevelandclinic.org/health/diseases/23145-esotropia (last visited Feb. 28, 2024).

of "a lot of headache located on the right side of his head," but his "visual acuity, visual field, and optic atrophy" were "grossly stable."  AR at 955.

*Dr. Schultz examined Mr. Lundberg on March 20, 2018.*  At this examination, Mr. Lundberg reported that he felt as if "someone [was] squeezing [the] back of [his right] eye" and that this sensation "worse[ned] w/ computer work-fatigue."  AR at 1268. Mr. Lundberg rated the severity of these "daily" headaches behind his right eye as "2–5/10."  *Id*.

*Mr. Lundberg was examined by a new provider, a neuro-ophthalmologist, beginning May 16, 2018.*  At this examination, Mr. Lundberg reported "blurry" vision, "very symptomatic" decreased vision, and "gray vision from center to periphery in the right eye."  AR at 1973.  He also described daily headaches that were "better since he has been laid off work," and that he "was unable to work on the computer."  *Id*.  The neuro-ophthalmologist, Marian Rubenfeld, M.D., documented "exotropia[28] @dist/near; no saccadic[29] deficit; pursuit deficit: right gaze, subtle, interruptions/jerking of gaze; convergence insufficiency: 10 PD exodeviation; [30] no hypertropia"[31] in Mr. Lundberg's

---

[28]    Exotropia is "[t]hat type of strabismus in which the visual axes diverge; may be paralytic or concomitant, monocular or alternating, constant or intermittent."  *Exotropia*, *Stedman's Medical Dictionary* (28th ed. 2006).

[29]    Saccadic means "[j]erky."  *Saccadic*, *Stedman's Medical Dictionary* (28th ed. 2006).

[30]    Exodeviation directs to exophoria, the "[t]endency of the eyes to deviate outward when fusion is suspended."  *Exophoria*, *Stedman's Medical Dictionary* (28th ed. 2006).

[31]    Hypertropia is "[a]n ocular deviation with one eye higher than the other."  *Hypertropia*, *Stedman's Medical Dictionary* (28th ed. 2006).

right eye.  AR at 1974.  Dr. Rubenfeld diagnosed Mr. Lundberg as suffering from ischemic optic neuropathy of the right eye, optic atrophy (nonspecific), fusion with defective stereopsis,[32] convergence insufficiency, other irregular eye movements, and myopia, astigmatism, and presbyopia in both eyes.  AR at 1976.  Dr. Rubenfeld recommended occupational therapy emphasizing "fixation, saccades, pursuit, convergence, [and] DynaVision," but she did not prescribe new glasses for Mr. Lundberg because, Dr. Rubenfeld explained, "I cannot improve his motility significantly."  AR at 1975.

*Dr. Rubenfeld next examined Mr. Lundberg on March 11, 2019.*  In a note documenting the examination, Dr. Rubenfeld repeated her earlier diagnoses and documented Mr. Lundberg's irregular eye movements as "interfer[ing] with any useful vision that he may have," and "com[ing] from the several incidences of head trauma which he has had since the ischemic optic neuropathy right eye."  AR at 3236.  Dr. Rubenfeld added: "This is AFTER he has had his therapy at Courage/Sr. Kenny,[33] so this is the best he can be."  *Id.*  Dr. Rubenfeld advised Mr. Lundberg to schedule his next appointment with her in one year.  *Id.*

---

[32]    In this context, "fusion" appears to reference "[t]he blending of slightly different images from each eye into a single perception."  *Fusion, Stedman's Medical Dictionary* (28th ed. 2006). Stereopsis directs to stereoscopic vision, which is "the single perception of a slightly different image from each eye."  *Stereoscopic vision*, *Stedman's Medical Dictionary* (28th ed. 2006).

[33]    Mr. Lundberg underwent extensive therapy to treat his eye condition.  This therapy is recounted beginning on the next page.

*Mr. Lundberg was next examined by a neuro-optometrist on August 6, 2020.*  The neuro-optometrist, Amy Chang, O.D., diagnosed Mr. Lundberg with photosensitivity[34] and "[i]ntermittent [a]lternating esotropia OD>>OS"[35] that was "compounded by visual field loss OD secondary to NAION."  AR at 2394.

*Between October 2017 and September 2018 Mr. Lundberg received therapy for his eye conditions.*  During this period, Mr. Lundberg had thirty-three occupational therapy outpatient appointments at Courage Kenny Rehabilitation Institute in an effort to treat his eye symptoms, fatigue, and headaches.  AR at 177–82 (Oct. 23, 2017), 185–91 (Oct. 27, 2017), 234–36 (Oct. 30, 2017), 271–73 (Nov. 3, 2017), 274–76 (Nov. 7, 2017), 277–79 (Nov. 10, 2017), 280–82 (Nov. 13, 2017), 3635–37 (Nov. 15, 2017), 289–91 (Nov. 21, 2017), 374–76 (Nov. 24, 2017), 378–81 (Nov. 27, 2017), 382–84 (Dec. 1, 2017), 386–89 (Dec. 4, 2017), 492–94 (Dec. 8, 2017), 496–99 (Dec. 11, 2017), 500–02 (Dec. 19, 2017), 553–55 (Jan. 2, 2018), 556–58 (Jan. 8, 2018), 559–61 (Jan. 15, 2018), 1764–67 (Jan. 22, 2018), 713–16 (Jan. 29, 2018), 716–19 (Feb. 6, 2018), 1795–98 (Feb. 20, 2018), 1808–11 (Feb. 26, 2018), 1812–15 (Mar. 9, 2018), 1816–19 (Mar. 19, 2018), 1834–37 (Mar. 26, 2018), 1852–55 (Apr. 2, 2018), 1876–78 (Apr. 9, 2018), 1896–99 (Apr. 16, 2018), 1925–28 (Apr. 30, 2018), 3243–46 (July 9, 2018), 3247–49 (Sept. 10, 2018).  Following what

---

[34]    Photosensitivity is the "[a]bnormal sensitivity to light, especially of the eyes.  For example, light may irritate the eyelids, conjunctiva, cornea or, in excess, the retina; when scattered by a cataractous lens light may produce glare; it can produce a migraine headache or a temporary exotropia."  *Photosensitivity*, *Stedman's Medical Dictionary* (28th ed. 2006).

[35]    In this context, OS appears to refer to the left eye, or oculus sinister.  *See OS, Stedman's Medical Dictionary* (28th ed. 2006).

would be his final appointment in September 2018, the occupational therapist who had been treating Mr. Lundberg noted that she and Mr. Lundberg concluded he had plateaued, and that Mr. Lundberg "would benefit from a break from therapy."  AR at 3247–48.  At that point, Mr. Lundberg had met a goal of "reading for 15–20 minutes at a time before needing a break" but remained unable to "tolerate computer/reading work for 1–2 hours without symptoms increased."  AR at 3248–49.

*Mr. Lundberg received additional occupational therapy between December 2020 and July 2021*.  During this period, Mr. Lundberg had eight appointments with occupational therapist Courtney Mitchell at Hennepin County Medical Center.  *See* AR at 3203–11 (Dec. 16, 2020), 3214–17 (Jan. 7, 2021), 2607–08 (Jan. 21, 2021), 2605–06 (Feb. 18, 2021), 3052–54 (Mar. 10, 2021), 2792–94 (Apr. 29, 2021), 3056–59 (July 8, 2021), and 3059–65 (July 22, 2021).  In a discharge summary note dated July 22, 2021, Ms. Mitchell described Mr. Lundberg's vision-related progress during the course of these sessions.  AR at 3060–3062.  In reading and computer use, Mr. Mitchell documented that Mr. Lundberg had made little-to-no progress, as shown by the following chart:

|  | 12/16/2020 | 7/22/2021 |
|---|---|---|
| Reading: | Baseline Level: Pt would sit and read for hours in one sitting. "I would read a whole book at one time" | |
| | Pt reports reading speed is less. pt reports he has to take a break after 5–10 min. | pt reports eye strain after 10 min sometimes will push through to 20 min but "pays for it" with increase in headache |
| Computer Use: | Baseline Level: pt uses phone and tablet more than computer. | |
| | pt reports he uses his ipad for game or phone, needs a break after 15–20 min | pt reports eye strain after 10 min sometimes will push through to 20 min but "pays for it" with increase in headache |

AR at 3060–61. Ms. Mitchell related her findings to Mr. Lundberg's ability to work, writing: "Pt has been on disability since March 2018 secondary to poor tolerance for sustained near work. Pt has had no significant change or improvement in these symptoms. Ability to complete computer based or near work job unchanged." AR at 3061. Ms. Mitchell's summary of Mr. Lundberg's vision symptoms showed no change or worsening symptoms in several areas. This included difficulty transitioning between distance and near, pressure or pain behind or around eyes, double vision, eye fatigue when reading or using a computer, headaches when reading or performing visual tasks, lightheadedness and disorientation with position changes, restricted field of vision and reduced peripheral vision, and sensitivity to light indoors and outdoors. AR at 3061–62. Based on her assessment, Ms. Mitchell concluded:

> Pt continues to have very poor vergence skills, as well as mild deficits in oculomotor control. Pt has been limited by increased symptoms with exercises which ha[ve] not improved over course of treatment. Pt has not seen any improvement in functional testing or improvement in tolerance with sustained near work, busy environments[,] or driving. Pt was disappointed to not see functional improvements but understands that since the length of time from injury has been long and the complication with field cut and other ocular deficits that notable functional gains is not likely. Pt has [plateaued] in progress and has no further skilled OT needs at this time.

AR at 3064.

Mr. Lundberg received medical treatment after several disequilibrium episodes and falls that occurred following his AION diagnosis. Mr. Lundberg's disequilibrium was first documented following an examination by neurologist Thuy An T Hoang-Tienor, M.D., on April 19, 2017. AR at 3368. Dr. Hoang-Tienor examined Mr. Lundberg to assess his "chronic daily headaches that started shortly after his episode of vision loss believed to be reflection nonarteritic anterior ischemic optic neuropathy, likely second to his severe hypertension." AR at 3367. Dr. Hoang-Tienor wrote that she "suspect[ed] that his sense of dysequilibrium [sic] may be secondary to his decreased vision in his right and [] perhaps the chronic daily headache could be contributing to some degree." AR at 3368. Later, Mr. Lundberg experienced several disequilibrium incidents and falls. AR at 1195–1200, 1580–84 (June 2017 fall from steps); AR at 11, 141–46, 894 (September 2017 fall in shower); AR at 155–58, 107–110 (October 2017 fall off steps); AR at 3636 (November 2017 fall inside house); AR at 637–42 (January 2018 fall in bathroom requiring medical treatment); AR at 1852–54, 1856–71 (April 2018 dizziness/disequilibrium resulting in

17

emergency room visit); AR at 3688–93 (August 2018 fall in bathtub requiring medical treatment); AR at 4051–60 (April 2019 fall requiring medical treatment); AR at 2353 (January 6, 2020 fall in home, causing tibia/fibula fractures). Mr. Lundberg's January 2020 fall seems to have been the most significant; it resulted in two surgeries and bone grafting to repair the fractures. AR at 2310–18, 2346. Mr. Lundberg "noted a pattern that his falls occur when he is turning his head to the right while moving his feet." AR at 142, 155, 894. And at least one doctor attributed his falls to "vision loss . . . affecting balance as this occurs only when tur[n]ing to the side with vision loss." AR at 146.

*Mr. Lundberg also received treatment for chronic headaches.* These treatment records appear in several places in the administrative record. *See* AR at 3351—3526, 3136–3202. In a note documenting her examination of Mr. Lundberg on April 19, 2017, Dr. Hoang-Tienor noted that Mr. Lundberg had a history of headaches beginning in childhood, and she recorded that Mr. Lundberg "[c]an't remember a time when he didn't have headaches." AR at 3361–62. Mr. Lundberg reported new and worsening headaches that emerged after his vision loss and optic nerve pressure began in January 2017— headaches that Mr. Lundberg described as "stabbing pain with some dull achiness," aggravated by computer use and fluorescent lights. AR at 3362–63. Dr. Hoang-Tienor prescribed a steroid "[t]o help break up headaches" and "decrease overall severity," directed Mr. Lundberg to maintain a "headache diary," and recommended "aggressive blood pressure control." AR at 3369. Over the next two and a half years, Dr. Hoang-Tienor prescribed several additional medications and treatments for Mr. Lundberg's headaches. AR at 3101, 3189, 3381–88, 3409, 3412, 3418, 3424, 3506, 3518. Though Mr. Lundberg

reported that he "continue[d] to have [chronic daily headaches] of fluctuating severity," AR at 3199, his medical records reflect uncertainty regarding the seriousness of this issue. In August 2017, Dr. Hoang-Tienor noted that "[a]t one point [Mr. Lundberg] says that he has not had constant headache pain since he saw me last, and that the headaches only started again in July 2017. Then, at another point in time, he said that his headaches NEVER went away . . . I asked him then about what his response to the sumatriptan + ketorolac treatment was and he said that he didn't have bad headaches." AR at 3381. Dr. Hoang-Tienor added that Mr. Lundberg's headache diaries did not include dates or months, were "filled out in . . . the same [red] ink pen for every daily entry," and merely stated "headache, lasting 'all day'" followed by "ditto marks for nearly all the spaces." AR at 3418, 3513. In addition, Mr. Lundberg would "[d]en[y] light and sound sensitivity," but then ask Dr. Hoang-Tienor to "kill the fluorescent lights [during his exam] because . . . the light aggravates the headache." AR at 3420. At Mr. Lundberg's final visit with Dr. Hoang-Tienor in December 2019, she again noted that it was "curious that [Mr. Lundberg] developed daily headaches after his NAION," and that she "cannot prove or disprove pain." AR at 3199.

*Mr. Lundberg suffered from mental- and cognitive-health challenges.* In 2018, Mr. Lundberg was diagnosed with adjustment disorder with mixed anxiety and depressed mood. AR at 1914–22. Mr. Lundberg attributed these issues to "life stressors"; among these, he identified "medical issues and being out of work." *Id.* In March 2019, neuropsychologist Susanne Cohen, Ph.D., noted "some abnormal [formal cognitive] findings," though she was "uncertain whether there [was] underlying cerebral dysfunction, or if other factors such as his chronic fatigue, pain/headaches, untreated sleep apnea, and

possibly underlying mood issues can account for cognitive inefficiency." AR at 3280. Dr. Cohen documented that Mr. Lundberg's "primar[]y weaknesses" were "rapid or complex visual processing," and she explained that "his persisting vision impairment is likely to be a factor in those findings." *Id*.

C

*Mr. Lundberg twice applied for short-term disability benefits, and Unum paid the claims.* After the AION in January 2017, Mr. Lundberg missed time from work that was covered by short-term disability benefits paid by Unum. Compl. [ECF No. 1] ¶ 84; Answer [ECF No. 5] ¶ 84. Between May 2017 and September 2017, Mr. Lundberg took time off intermittently that was covered by his paid time-off account. Compl. ¶ 85; Answer ¶ 85. After his September 2017 fall in the shower, Mr. Lundberg filed a second short-term disability claim based on primary diagnoses of "chronic fatigue, anemia, syncope, [and] headaches caused by eye issues." AR at 102–03. A family-medicine physician, Jennifer Auge, M.D., signed Mr. Lundberg's short-term disability claim form as Mr. Lundberg's attending physician. AR at 103. In a follow-up form completed at Unum's request, Dr. Auge documented Mr. Lundberg's "ongoing fatigue, frequent falls, and severe headaches" as the specific conditions on which her disability finding was based. AR at 109. Unum approved Mr. Lundberg's second claim for short-term disability benefits. AR at 11. Unum identified several justifications for this decision, including "chronic fatigue . . . on a downward trend," headaches, and "suspected vision loss . . . affecting balance and this occurs only when turning to the side with vision loss." AR at 11. Unum paid Mr. Lundberg all of his requested short-term disability benefits. *See* ECF

20

No. 28 at 26–27; Compl. ¶ 87.  Owing to essentially these same issues, Blue Cross placed

Mr. Lundberg on medical leave beginning March 12, 2018.  AR at 1817, 1354.

*Mr. Lundberg applied for long-term disability benefits, and Unum approved his*

*claim.*[36]  Unum determined Mr. Lundberg's date of disability to be September 16, 2017,

and his long-term disability benefits commencement date to be March 17, 2018.  AR 1213–

16, 1221.  In a report dated April 5, 2018, Unum summarized Mr. Lundberg's situation:

> This is a 48 yom Recovery Specialist who last worked 9/13/17.
> Insured has vision loss in his right eye and was diagnosed with
> Nonarteritic anterior Acute Ischemic Optic Neuropathy-
> sequential right eye, subjective visual disturbance,
> pseudopapilledema, bilateral, Drusen of Optic Disc bilaterally,
> Alternating esotropia.  The right optic disc is swollen, and the
> left eye also shows pseudopapilledema with the appearance of
> Drusen of the optic discs.
>
> He has reported numerous falls when turning to the right,
> presumably due to vision loss in the right eye, as there does not
> appear to be an explainable neurological basis for it.  He has
> had an extensive diagnostic workup that does not reveal any
> other glaring pathology that would explain his symptoms, other
> than slightly elevated inflammatory markers.
>
> He is currently in Physical therapy and he RTW part time
> 10/24/17.  He requires prism glasses to see his computer screen
> but can only tolerate it for a few hours a day and he still has
> complaints of severe headaches and fatigue/eye-strain as the
> day goes on.

---

[36]     The parties do not cite—and the administrative record does not seem to contain—
an application or claim form that Mr. Lundberg filed in support of his long-term disability
benefits claim.  In its briefing, Unum explains that, while Mr. Lundberg was receiving
short-term disability benefits, Unum "requested additional information from Dr. Auge and
Plaintiff's medical records to determine eligibility for LTD benefits."  *See* ECF No. 22 at
4 (citing AR at 108–18).  I understand this to mean that Unum considered Mr. Lundberg
for long-term disability benefits without requiring him to file a separate application.

> Given his documented visual field deficits and consistent ongoing symptoms, the R&L's are reasonable and supported and may end up being long-term as it has been > 1 year and there has been no improvement in symptoms despite treatment.

AR at 1208.  In a letter dated April 6, 2018, Unum advised Mr. Lundberg of its decision to approve his claim.  The letter included an explanation of the reasons underlying Unum's decision:

> We approved your benefits because you are unable to perform the material and substantial duties of your occupation as a senior recovery specialist on a full-time basis *due to your medical condition of ischemic optic neuropathy of the eye*. Your benefits will continue as long as you meet the definition of disability in the policy provided by your employer and are otherwise eligible under the policy terms. . . .
>
> Based on a review of your medical records to date, the typical recovery time for your medical condition would be expected to be long-term for part-time work capacity.

AR at 1214 (emphasis added).  Unum began paying long-term disability benefits on March 17, 2018, in the amount of $2,282.80 per month.  AR at 11, 1213–16.

*Mr. Lundberg was approved for Social Security disability benefits, and Unum continued to approve and pay his long-term disability benefits claim.*  In October 2019, Mr. Lundberg was ruled disabled for purposes of Social Security disability insurance benefits, with a benefit-commencement date of March 12, 2018.  AR at 4263–72.  Around that same time, on October 30, 2019, a claims representative with Unum recommended that Mr. Lundberg be approved for continuing long-term disability benefits even after his disability test changed from "regular occupation" to "any gainful occupation" at the 24-month mark, explaining:

> Based on [Mr. Lundberg's] reported ongoing symptoms, prior medical review and recent SSDI award it is reasonable that [Mr. Lundberg] would not have FT capacity for any gainful occ at this time.  Requesting CID approval.

AR at 2117 (entry dated 10/30/2019).  That same day, Unum approved Mr. Lundberg for continued long-term disability benefits.  *See* AR at 2118.

*Information continued to support Mr. Lundberg's claim.*  On November 4, 2020, Dr. Auge submitted a disability status update for Mr. Lundberg.  AR at 2195–97.  Dr. Auge reported that Mr. Lundberg was experiencing "loss of vision R eye, irregular eye movements both eyes, [and] chronic headache."  AR at 2195.  She documented his "permanent loss of visual acuity and central and peripheral visual fields in right eye, [and his] loss of ability to read because of jerking of eyes to right constantly."  *Id*.  Dr. Auge described Mr. Lundberg's physical restrictions and limitations as follows: "Patient is functionally blind.  Has reached maximum medical intervention & improvement."  AR at 2196.  Finally, Dr. Auge stated that "Currently no medications exist to help this blindness and visual afflictions."  AR at 2197.  In a disability status update form dated November 2, 2020, Mr. Lundberg wrote that he was "unable to read or use computer for more than 10 min at time due to vision and head injury issues."  AR at 2203.  Mr. Lundberg also explained that he used a "cane for balance and sight loss aide" and that his spouse also provided assistance "with items I cannot see."  *Id.*

*On November 9, 2020, Unum approved Mr. Lundberg to receive continued long-term disability benefits.*  At least initially, this decision seems to have held significance.  Unum set Mr. Lundberg's claim to remain in "core" for "annual updates."

*See* AR at 2216–17. It is not clear from the record what precise meaning the "core" designation held, but the fact that Unum would only require annual updates from this point forward suggests that Unum believed Mr. Lundberg's condition was not likely to change and that he was likely to remain disabled and entitled to receive long-term disability benefits. In its claim review summary, Unum explained: "Based on the medical and vocational information in the file, as well as updated . . . forms, it is reasonable to conclude that [Mr. Lundberg] has not regained [functional capacity] to [return to work]." *Id.* Unum also noted Dr. Auge's opinion that Mr. Lundberg "has reached maximum medical improvement and will not get any better." *Id*.

*In December 2020, Unum decided to reexamine Mr. Lundberg's claim, and this reexamination led Unum to terminate Mr. Lundberg's benefits.* On December 30, 2020—less than two months after determining that Mr. Lundberg was not able to return to work and setting his claim for annual updates—Unum notified Mr. Lundberg that it was reevaluating his claim. *See* AR at 2255–56. What triggered this review is not clear. A note in the administrative record indicates that Unum believed Mr. Lundberg was "working part time and improvement was thought to be possible." AR at 2248–49. This information was inaccurate. Mr. Lundberg had not worked for about three years. *See* AR 1354, 1817; Compl. ¶¶ 84–91. But Unum proceeded with this understanding as it reevaluated Mr. Lundberg's claim. *See* ECF No. 28 at 31; AR at 2251–52, 2509–11, 2595, 2656, 2816, 2820. Unum notified Mr. Lundberg of its decision to terminate his long-term disability benefits in a letter dated August 6, 2021. AR at 2876–83. Though Mr. Lundberg had received benefits for more than twenty-four months—meaning the Plan required his claim

24

to be evaluated against the "any gainful occupation" standard—Unum determined that "as of August 6, 2021," Mr. Lundberg was able to perform the duties of his occupation. AR at 2879. Unum wrote that its decision was supported by two physicians who had reviewed Mr. Lundberg's medical records. *See* AR at 2878–79.[37] First, a "physician board certified in Internal Medicine" concluded "it is unclear why [Mr. Lundberg] would be precluded from performing" his own occupation. AR at 2878. This doctor noted that Mr. Lundberg had "normal, corrected visual acuity," that his condition had "improve[d] . . . in occupational/visual therapy," and that Mr. Lundberg possessed the ability to drive a car and use electronic devices. *Id.* Second, a board-certified ophthalmologist concluded that "[t]he available medical records and clinical exam findings do not support the restrictions of Dr. Auge." AR at 2879. In reaching this conclusion, the ophthalmologist (like the internal-medicine physician) relied on Mr. Lundberg's corrected visual acuity, Mr. Lundberg's ability "to drive, read, watch TV, use an iPad and computer," his ability "to perform activities of daily living and chores around the house such as light cleaning and dishes," and his ability to "garden[] and fish[]." *Id.* Unum acknowledged that Mr. Lundberg had been approved to receive Social Security disability benefits. *Id.* Regardless, Unum explained, the improvements shown in Mr. Lundberg's more recent medical records and activities—including his "ability to drive for several hours"—were not part of the Social Security record and justified Unum's termination decision. *Id.*

---

[37]    Neither physician is identified by name in the letter. *See* AR at 2878–79. Documents in the administrative record show that the internal-medicine physician was Sabrina Hammond, M.D. AR at 2834. The ophthalmologist was Sami Kamjoo, M.D. AR at 2855.

*In line with the Plan's terms, Mr. Lundberg appealed Unum's termination decision.*
Mr. Lundberg filed his appeal on December 1, 2021.  AR at 4247–4252.  To support the
appeal, Mr. Lundberg submitted excerpts from opinions concerning his medical issues and
functional capacity from his treating physicians and therapists.  *Id*.  These included
opinions regarding Mr. Lundberg's visual diagnoses, headaches, equilibrium issues
(including "jerking to right gaze"), and falls.  *Id.*; *see also* AR at 3746–41.  Mr. Lundberg
also provided Unum with medical records and opinions he had submitted to Social
Security, including a June 5, 2019 statement from Dr. Rubenfeld, who opined that
Mr. Lundberg's vision issues included:

> Blurred vision, permanent in R eye, also loss of central and
> peripheral visual fields in R eye.  Loss of ability to read
> because of lack of convergence and jerking of eyes to right
> gaze.  Loss of depth perception.

AR at 3258.   In another letter addressing Mr. Lundberg's functional capacity,
Dr. Rubenfeld opined that Mr. Lundberg would "never" be able to perform work activities
involving near acuity, far acuity, depth perception, accommodation, color vision, or field
of vision.  AR at 3259.  In a statement dated August 26, 2019, Dr. Rubenfeld opined that
Mr. Lundberg would be "functionally blind for the rest of his life," that "no treatments exist
to restore sight or improve irregular eye movements," and that he was "unable to return to
his . . . occupation and is unable to see properly to pursue another occupation."  AR at
4211.  Mr. Lundberg also submitted medical records that post-dated Unum's termination
decision.  In an examination summary dated September 7, 2021, a neuro-optometrist, Les
Alsterlund, O.D., opined that Mr. Lundberg "is unable to work on computer due to saccadic

disorder and ambient vision dysfunction interfering with reading and screens." AR at 3782. Mr. Lundberg submitted records from Dr. Schultz. AR at 3755. Dr. Schultz examined Mr. Lundberg on September 20, 2021, not long after Unum's termination decision; she noted Mr. Lundberg's visual and balance issues. *Id.* Mr. Lundberg also submitted reports from Dr. Auge dated August 2, 2021, and November 17, 2021, stating that Mr. Lundberg was "unable to work at this time" due to his headaches, vision, and balance issues. AR at 2861–64, 3754. Mr. Lundberg asserted that he did "not possess the visual acuity to perform the work in question." AR at 4247. He wrote: "The constant head movements to try to keep a field of functional sight causes vertigo, eye strain and increased efforts for improvement through therapy and accommodations for a workspace/schedule have failed." AR at 4251–52. Mr. Lundberg requested "full restoration of the benefits dating back to the first day UNUM stopped payment on August 7, 2021." AR at 4252.

*Unum affirmed its decision to terminate Mr. Lundberg's benefits.* Unum explained the basis for its appeal decision in a letter dated December 31, 2021. AR at 4289–95. As with its initial termination decision, Unum's appeal decision addressed whether Mr. Lundberg was able to perform his "regular occupation." *See id.* Unum's appeal decision relied primarily on a report prepared by Unum's "appellate physician, who is board certified in family practice." AR at 4290. The physician, Christopher Bartlett, M.D., issued the report on December 23, 2021. AR at 4280–84. In his report, Dr. Bartlett concluded that Mr. Lundberg was not disabled "from a whole person perspective" as of August 6, 2021. AR at 4291. Dr. Bartlett opined that Mr. Lundberg's reported level of

activity—including an interstate drive from Arizona to Minnesota in July 2021,[38] lawn mowing, and television watching—was "most consistent with retained sedentary functional capacity." AR at 4281. Dr. Bartlett also cited Mr. Lundberg's near-normal corrected visual acuity, his purported return to work fifteen months after the ischemic incident, and his ability to "self-manage[]" his headaches. AR at 4281–83.

*Mr. Lundberg filed this case in September 2022.* Compl. The Complaint asserts a claim for benefits under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(1)(B). Compl. ¶¶ 127–30. For relief, Mr. Lundberg seeks benefits due plus interest and reasonable attorneys' fees and costs. *Id.* at 25.

## II

### A

Suits brought under § 1132(a)(1)(B) to recover benefits allegedly due to a participant are reviewed de novo unless the benefit plan gives the administrator

---

[38]   For his understanding that Mr. Lundberg had driven from Arizona to Minnesota, Dr. Bartlett relied, in part, on occupational therapist Mitchell's treatment note from July 8, 2021, in which she apparently quotes Mr. Lundberg:

> **Subjective:** "My father passed away 3 weeks ago. I was down there when he was hospitalized and he ended up getting worse and passing away. I was there for 3.5 weeks. Symptom wise things have been about the same. Clearly more stress. I drive back from AZ with my daughter. The driving its self is not so bad, its just the eye strain. I got the new car with the new safety features which helps. Highways is better I can go an hour or two before I feel it and it bothers me. If I stop and go to the bathroom and shut my eyes for a while I feel better and can keep going."

AR at 3057; *see also* AR at 4282.

discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan grants the administrator such discretion, then "review of the administrator's decision is for an abuse of discretion." *Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 714 (8th Cir. 2019) (quoting *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 759 (8th Cir. 2012)). Here, the parties agree that Mr. Lundberg's claim and Unum's termination decision should be reviewed de novo. *See* ECF No. 29 ¶ 3. Based on the parties' agreement, de novo review will be applied. *Avenoso v. Reliance Std. Life Ins. Co*., 19 F.4th 1020, 1025 (8th Cir. 2021) (applying de novo review where parties agreed the claims administrator lacked discretionary authority).

Under the de novo standard, a district court must make an independent decision regarding benefits, affording no deference to the plan administrator's decision. *Firestone Tire and Rubber Co.*, 489 U.S. at 112 (*accord Kaminski v. UNUM Life Ins. Co. of Am*., 517 F. Supp. 3d 825, 858 (D. Minn. 2021)). A district court must determine "whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Kaminski*, 517 F. Supp. 3d at 858 (citations and internal quotations omitted). The claimant bears the burden of showing he is disabled and entitled to benefits under the plan. *Farley v. Benefit Tr. Life Ins. Co*., 979 F.2d 653, 658 (8th Cir. 1992). And when, as here, parties request a ruling under Rules 39(b) and 52(a)(1), a district court acts as a factfinder, resolving fact disputes, making credibility determinations, and weighing the evidence. *See Avenoso*, 19 F.4th at 1026; *Chapman v. Unum Life Ins. Co. of Am*., 555 F. Supp. 3d 713, 716 (D. Minn. 2021).

B

For several reasons, I conclude that a preponderance of the evidence supported Mr. Lundberg's long-term disability benefits claim as of August 2021 and shows that Unum's termination decision was not correct.

(1) Mr. Lundberg's primary claim-prompting health problems resulted from anterior ischemic optic neuropathy (or "AION") in his right eye, and there is no dispute that Mr. Lundberg experienced this condition.   A neuro-ophthalmologist, Dr. Lee, first diagnosed the condition in January 2017.  AR at 1015.  Dr. Lee repeated the diagnosis in February 2017 and February 2018.   AR at 949, 954.   In May 2018, a second neuro-ophthalmologist, Dr. Rubenfeld, diagnosed Mr. Lundberg as having suffered the condition.  AR at 1975.  The administrative record includes no information suggesting that Dr. Lee, Dr. Rubenfeld, or any one of Mr. Lundberg's treating physicians repudiated or had second thoughts regarding the AION diagnosis.  Unum never disputed the diagnosis.  The condition was the basis for Unum's initial approval of Mr. Lundberg's claim.  AR at 1214 ("We approved your benefits because you are unable to perform the material and substantial duties of your occupation as a senior recovery specialist on a full-time basis *due to your medical condition of ischemic optic neuropathy of the eye*." (emphasis added)).  Unum's appellate physician noted that Mr. Lundberg had been "diagnosed with anterior ischemic optic neuropathy" without challenging the diagnosis's correctness.  AR at 4290; *see* AR at 4290–92.  The same was true of Unum's initial termination decision.  Unum acknowledged Mr. Lundberg had been diagnosed with AION, AR at 2878, and neither of

the reviewing physicians who weighed in regarding Unum's initial denial questioned the diagnosis, *see* AR at 2877–79.

(2) The better take on the administrative record is that Mr. Lundberg suffered from ongoing, functionality-impairing symptoms resulting from AION when Unum terminated benefits. Mr. Lundberg suffered altitudinal field defect, meaning he was not able to see peripherally above or below the horizontal midline. AR at 949, 1023. This condition was not expected to improve, AR at 1023, and Unum has not cited or identified records showing that the condition improved. Mr. Lundberg complained of other significant symptoms. These included "intermittent vertigo when focusing at work or watching tv," AR at 950, eye pain as if "someone [was] squeezing [the] back of [his right] eye," AR at 1268, headaches, double vision, eye strain, light sensitivity, night glare, AR at 1297, and disequilibrium, AR at 3368. Mr. Lundberg reported that these symptoms prevented him from working at a computer except for brief periods. AR at 1973. Though these symptoms are fairly described as subjective to some degree, medical records support the conclusion that Mr. Lundberg experienced several of them. Dr. Rubenfeld, for example, observed that Mr. Lundberg experienced irregular eye movements, including "jerking of gaze," AR at 1974–75, and found that Mr. Lundberg's irregular eye movements "interfere[d] with any useful vision that he may have," AR at 3236. Dr. Hoang-Tienor attributed Mr. Lundberg's disequilibrium as "secondary to his decreased vision in his right eye," AR at 3368, and in fact Mr. Lundberg experienced several disequilibrium incidents and falls resulting in sometimes serious injuries between June 2017 and January 2020, *see* AR at 1195–1200, 1580–84 (June 2017); AR at 11, 141–46, 894 (September 2017); AR at 155–58, 107–110

31

(October 2017); AR at 3636 (November 2017); AR at 637–42 (January 2018); AR at 1852–54, 1856–72 (April 2018); AR at 3688–93 (August 2018); AR at 4051–60 (April 2019); AR at 2353 (January 2020).  Dr. Auge attributed Mr. Lundberg's falls to "vision loss . . . affecting balance" because the falls occurred when Mr. Lundberg turned to "the [right] side with vision loss."  AR at 146.

(3) The administrative record contains evidence connecting Mr. Lundberg's AION and resulting symptoms specifically to his inability to perform his regular occupation.[39] Mr. Lundberg's "senior recovery specialist" position with Blue Cross—like the "insurance claim examiner" occupation Unum found to be comparable—required Mr. Lundberg to work at a computer for most of the day and required frequent near visual acuity.  AR at 915, 2251, 2509, 2513, 2820, 2821, 4274, 4276.  Dr. Rubenfeld documented her opinion that Mr. Lundberg's AION-related symptoms caused him to be "unable to work on the

---

[39]    Mr. Lundberg had received more than twenty-four months of benefit payments by the time Unum terminated benefits, meaning Unum should have answered whether Mr. Lundberg was "unable to perform the duties of any **gainful occupation** for which [he was] reasonably fitted by education, training or experience."  AR at 69.  Unum determined that Mr. Lundberg was capable of performing his "regular occupation."  AR at 4293 ("As you no longer have medical restrictions and limitation [sic] to preclude performing the functional demands for your occupation, you are not disabled under the policy.").  In reaching this decision, Unum either misapplied the "regular occupation" standard that governs the first twenty-four months of benefit payments or perhaps answered the "any gainful occupation" question by reference just to whether Mr. Lundberg was capable of performing his regular occupation.  Either way, considering the controlling Plan terms and Unum's rationale, the dispositive issue is whether the record evidence shows that Mr. Lundberg was able to perform the duties of a gainful occupation solely by reference to whether he was able to perform the functional demands of his regular occupation.  Beyond its determination that Mr. Lundberg was able to perform his regular occupation, Unum did not address whether Mr. Lundberg was able to perform the duties of any gainful occupation.  In other words, the record lacks any evidence that might support a finding that Mr. Lundberg might be able to perform some other occupation.

computer," AR at 1973, and disrupted his useful vision, AR at 3236.  Occupational therapist Mitchell documented that Mr. Lundberg's ability to read was limited to five-to-ten-minute intervals and that his computer use was limited to fifteen-to-twenty-minute intervals.  AR at 3060–61.  Ms. Mitchell explained that, as a result, Mr. Lundberg had "poor tolerance for sustained near work" and that he remained unable to perform computer-based work.  AR at 3061; *see* AR at 3249 (documenting that Mr. Lundberg remained unable to "tolerate computer/reading work for 1–2 hours without symptoms increased").  Ms. Mitchell also documented that occupational therapy had not improved Mr. Lundberg's functional capacity and that, in light of his "field cut and other ocular deficits . . . notable functional gain[] is not likely."  AR at 3064.

(4) Unum's termination decision is not persuasive because the primary evidence Unum cited for the decision was largely beside the point and unclear in relation to the evidence supporting Mr. Lundberg's claim.  To recap, Unum did not dispute that Mr. Lundberg was limited from performing his regular occupation "beginning March 12, 2018."  AR at 4293 ("We do not dispute that you were disabled and unable to perform your regular occupation or any occupation for a period of time beginning March 12, 2018.").  In its appeal letter dated December 31, 2021, Unum explained it had found that Mr. Lundberg had "demonstrated improvement and ability to function at a level consistent with sedentary work to perform your occupation."  *Id.*  To support this conclusion, Unum relied primarily on records showing that Mr. Lundberg's corrected visual acuity is close to normal and that Mr. Lundberg had road-tripped from Arizona to Minnesota in July 2021.  *See* AR at 2878, 4292–93.  Unum is right about the first point—several medical records show that

Mr. Lundberg's corrected visual acuity is near normal. *See, e.g.*, AR at 950 (noting that Mr. Lundberg's corrected vision was 20/40 + 2 in the right eye and 20/20 in the left eye). But this does not address or undermine the facts that Mr. Lundberg suffered an AION, that he continued to experience significant symptoms as a result, and that these symptoms prevented Mr. Lundberg from working at a computer for more than brief periods. Neither Mr. Lundberg nor his health-care providers have ever said that he was unable to "see" a computer screen (though there may have been occasions where his blurred vision prevented it). Their point is that Mr. Lundberg's AION-triggered symptoms—including things like jerking of gaze and other irregular eye movements—prevented Mr. Lundberg from working at a computer for more than brief periods. That Mr. Lundberg's corrected visual acuity is close to normal does not address these problems or undermine Mr. Lundberg's providers' opinions that rendered Mr. Lundberg disabled.[40] It would be a mistake to find that Mr. Lundberg was not disabled based on the July 2021 road trip. The administrative record contains only brief descriptions of the trip. *See* AR at 3057, 4282. These do not describe the distance or duration of Mr. Lundberg's driving. Unum interprets the records to mean that Mr. Lundberg did all the driving, but the records do not say that specifically, and they note that Mr. Lundberg drove with his daughter. AR at 3057. Regardless, driving

---

[40]    Unum recognized this distinction when it approved Mr. Lundberg's claim. Unum approved the claim based on Mr. Lundberg's "medical condition of ischemic optic neuropathy of the eye," AR at 1214, and his "reported ongoing symptoms," AR at 2117. Unum did not approve Mr. Lundberg's claim based on his near-sightedness.

was not a material and substantial duty of Mr. Lundberg's occupation, meaning whatever driving ability he possessed does not show his ability to perform his regular occupation.[41]

(5) Unum's termination decision is not persuasive because its substance did not fairly correspond to the complexity of Mr. Lundberg's health situation. Mr. Lundberg's primary problems—AION and its resulting symptoms—seem medically complex. As might be evident from the summary of medical records and the many footnotes in Part I, above, understanding these aspects of Mr. Lundberg's health history prompted heavy reliance on definitional resources. The effect these conditions and symptoms have on Mr. Lundberg's functionality has been the subject of extensive evaluation by ophthalmological specialists, testing, and occupational therapy. And Mr. Lundberg has several other significant comorbid conditions. Unum's termination decision does not compare with this extensive record. Unum did not examine Mr. Lundberg. It retained three physicians to review his records. Of these three physicians, one was an ophthalmologist. The other two were board-certified in internal medicine and family practice. All three physicians relied on a comparatively narrow set of facts to support their opinions regarding Mr. Lundberg's functionality. *See* AR at 2878–79, 4290–94.

(6) Unum's physicians' opinions are problematic in other respects. For example, the internist who reviewed Mr. Lundberg's records as part of Unum's initial termination decision concluded that Mr. Lundberg could "perform . . . activities of daily living, read,

---

[41] If Unum's point is that Mr. Lundberg's ability to drive is inconsistent with his claimed inability to work at a computer, this conclusion is neither self-evident nor sufficiently developed in the record.

watch TV and use computer and cell phone and Ipad [sic] *despite with reported limitations*." AR at 2878 (emphasis added). Though the internist acknowledged that Mr. Lundberg had limitations, the internist did not address the dispositive question of whether Mr. Lundberg's limitations were disabling. *See id.* The ophthalmologist who reviewed Mr. Lundberg's records wrote that Mr. Lundberg "ha[d] been seen by multiple Ophthalmologists and Neuro-Ophthalmologists and there were no restrictions/limitations certified by these providers." AR at 2879. This is not a fair description of the record. It is considerably more accurate to say that, beginning with Dr. Lee, the physicians who examined Mr. Lundberg agreed he had experienced anterior ischemic optic neuropathy in his right eye and suffered a variety of symptoms as a result. None of these physicians appears to have questioned whether Mr. Lundberg's vision problems interfered with his ability to work on a computer. Unum's appellate family-medicine physician evidently understood that Mr. Lundberg "returned to work for 15 months after the ischemic incident." AR at 4291. This is incorrect. Mr. Lundberg suffered the AION in January 2017, and he began missing work and receiving short-term disability benefits almost immediately. Compl. ¶ 84. It is true that Unum began paying benefits to Mr. Lundberg effective March 17, 2018, or roughly fifteen months after Mr. Lundberg suffered the AION, but this does not mean Mr. Lundberg was working up to that date. To the contrary, the Plan's elimination period required that Mr. Lundberg have been "continuously disabled" until "the later of . . . 180 days; or the date [his] self-insured Short-Term Disability payments end, if applicable." AR at 69. In other words, to be eligible to receive benefits beginning

March 17, 2018, Mr. Lundberg could not have "returned to work for 15 months" after experiencing the AION.

(7) Unum's decision is not persuasive in light of Eighth Circuit cases addressing decisions terminating ERISA benefits. "[I]n determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002); *see also Kaminski*, 517 F. Supp. 3d at 859. This does not mean that "paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *McOsker*, 279 F.3d at 589. Here, Unum has not identified information regarding Mr. Lundberg's medical condition that changed in some material respect. For example, it has always been true that Mr. Lundberg's corrected visual acuity was near-normal. Mr. Lundberg's Arizona-to-Minnesota road trip might represent new information, but for the reasons discussed earlier, this is not significant information as presented in this record. If some other aspect of Mr. Lundberg's medical situation changed, Unum did not identify it.[42]

---

[42]     Unum defends its decision to deny benefits in part by relying on medical records generated during the time it was paying benefits. *See, e.g.*, ECF No. 30 at 5–8 (relying on Dr. Hoang-Tienor's treatment notes); ECF No. 22 at 5, 23–25 (same). This is incongruous with the notion of a significant change in Mr. Lundberg's condition.

C

Unum argues that, if Mr. Lundberg is awarded benefits, the award should be "limited to benefits up through the final benefits decision on appeal (December 31, 2021)." ECF No. 22 at 28. Unum also argues that "in no circumstances can benefits be awarded beyond the Regular Occupation Period, which ends after 24 months of payments." *Id.* This is because, Unum argues, "Plaintiff's claim was reviewed exclusively under the Regular Occupation standard," meaning the administrative record lacks evidence regarding Mr. Lundberg's ability to perform the duties of any "gainful occupation," as the Plan defines that term. *Id.* at 29.

These arguments are not persuasive. (1) It is difficult to understand how a benefits award could be limited to the twenty-four-month regular-occupation period because Unum already paid Mr. Lundberg benefits beyond that point. The twenty-four months in which the "regular occupation" standard governed Mr. Lundberg's claim expired March 17, 2020, or several months before Unum terminated benefits. Without ordering Mr. Lundberg to return benefits Unum paid him, limiting Mr. Lundberg's benefits to the twenty-four-month regular-occupation period seems impossible. (2) Limiting benefits because of the absence of information regarding the any-gainful-occupation standard would seem just as problematic. It would either reward Unum for mistakenly adjudicating Mr. Lundberg's claims under the regular-occupation standard or ignore the chance that Unum adjudicated Mr. Lundberg's claim under the correct any-gainful-occupation standard solely by reference to his ability to perform his own occupation. (3) This is one of those cases where it makes better sense to award benefits up through the date of judgment. The administrative

record contains numerous medical and occupation-therapy records describing how Mr. Lundberg's condition has plateaued.  Though Unum of course remains free to reevaluate Mr. Lundberg's claim at any time by reference to his ability to perform occupations other than his own, Unum has identified no reason to think that Mr. Lundberg's benefits obviously deserve termination if considered from that perspective.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Plaintiff Bradley J. Lundberg's Motion for Judgment on the Administrative Record [ECF No. 26] is **GRANTED**.

2.     Defendant Unum Life Insurance Company of America's Motion for Judgment on the Administrative Record [ECF No. 20] is **DENIED**.

3.     Unum shall pay Mr. Lundberg benefits due from the date of termination to the present.  The parties shall meet and confer regarding the amount of benefits due, the amount of prejudgment interest, Mr. Lundberg's claim for attorney's fees and costs, and any other issues that would require court adjudication absent the parties' agreement.  If the parties agree on these amounts, they shall submit a joint proposed order for judgment.  If the parties do not agree on one or more of these amounts, they shall contact the Court to establish a briefing schedule and hearing date.


Dated: April 4, 2024                          s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court